[Cite as *State v. Elmore*, 2016-Ohio-890.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 14 JE 0021 |
| VS. | ) | |
| | ) | OPINION |
| ANTHONY Q. ELMORE | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 13 CR 209 B

JUDGMENT:    Conviction affirmed; sentence vacated and remanded for resentencing.

APPEARANCES:

For Plaintiff-Appellee    Attorney Jane Hanlin
Jefferson County Prosecutor
16001 State Route 7
Steubenville, Ohio 43952

For Defendant-Appellant    Attorney Eric Reszke
100 North 4th Street
Suite 810, Sinclair Building
Steubenville, Ohio 43952

JUDGES:

Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Carol Ann Robb

Dated: March 4, 2016

DeGENARO, J.

{¶1} Defendant-Appellant, Anthony Q. Elmore, aka Cadillac, appeals the judgment of the Jefferson County Court of Common Pleas convicting him of one count of felonious assault with a firearm specification and one count of weapons under disability and sentencing him accordingly. On appeal, Elmore argues that his convictions are against the manifest weight of the evidence and that the 14 year sentence imposed by the trial court was erroneous.

{¶2} Upon review, the jury did not lose its way convicting Elmore; there was overwhelming evidence of his guilt. However, the trial court erred by failing to make some of the required findings relative to consecutive sentences during the sentencing hearing. Accordingly, Elmore's conviction is affirmed, but his sentence is vacated and the matter is remanded for resentencing.

### Facts and Procedural History

{¶3} Elmore was indicted on one count of felonious assault, R.C. 2903.11(A)(2), a second-degree felony, with an attached firearm specification, R.C. 2941.145; and one count of weapons under disability, R.C. 2923.13(A)(3), a third-degree felony. The indictment was later amended to correct a case number reference to Elmore's earlier conviction. Elmore, along with Williams Ross who was charged separately and ultimately pled guilty, were accused of ambushing rival gang members and ultimately shooting and injuring Torrance Lyda, aka Marley. At the time of the shooting it was also alleged that Elmore was under a weapons disability.

{¶4} Elmore was arraigned, pled not guilty and counsel was appointed. Elmore filed a motion to suppress the statement he made to police, but this was overruled by the trial court following a hearing. The matter proceeded to a jury trial. The following pertinent evidence was adduced at trial.

{¶5} On the day of the incident, Steubenville Patrolman Lance Bickerstaff responded to a report of shots fired near George Street, but found no evidence or suspects at that time. Three days later, he found a gun under some brush in a nearby wooded area. Later, forensic DNA analyst Samuel Troyer tested the gun, but testified he was unable to find any DNA on it.

{¶6} Two days later, Steubenville Patrolman Sean Exterovich arrested William Ross pursuant to a felony warrant on an unrelated incident. Ross had an untreated gunshot wound and told Exterovich that several days earlier he had been confronted in a wooded area near George Street by five people and was shot in the leg by a man he knew as Marley.

{¶7} Maurice Jury, 16 years old at the time of trial, testified that on the day of the shooting he was walking with Devin Brandon, Aaron Richmond and a man he knew only as Marley. They eventually walked passed a porch where William Ross and a man he knew as Cadillac were standing. He identified Elmore as Cadillac. He saw Ross lift up his shirt to display a weapon, and Elmore with his hand in his pocket. The three young men continued to walk, eventually going down a hill. Jury then heard a sound coming from a nearby wooded area, which turned out to be Ross, who had slipped, and had started shooting at them. Jury also saw Elmore in the wooded area. He heard what sounded like multiple shots from two different guns. Jury said he was associated with the So Nike gang and that Ross and Elmore associated with the Grape Street gang. There was discord between the two gangs, especially following a murder of a So Nike affiliate that was blamed on a member of Grape Street. On cross-examination, Jury testified that nobody from his group shot at Ross and Elmore; he said he did not know how Ross got shot.

{¶8} Seventeen-year-old Devin Brandon's testimony corroborated Jury's version of events. He added that even after Ross fell to the ground and stopped shooting, he heard shots fired from inside the wooded area. On cross, he admitted he was incarcerated for a drug charge, and that he never saw Elmore shooting. He also admitted that he and his friends walked past Elmore and Ross that day even though they knew there could be trouble.

{¶9} Seventeen-year-old Aaron Richmond's testimony corroborated that of Brandon and Jury.

{¶10} William Ross testified that he was serving a 5 year sentence for his conviction for the Torrance Lyda shooting. He said he had not been promised

anything in exchange for his testimony. Ross advanced that he knew the Appellant for approximately five to six months.

{¶11} On the day of the incident, Ross explained he was on a porch on Jefferson Street with Elmore and others. He saw Lyda walking past him, accompanied by Jury, Richmond and Brandon. No conversation was exchanged between the two groups; they engaged in a "stare-down."

{¶12} Ross stated there were bad feelings between him and Lyda because he believed Lyda was involved in the death of his friend. Ross admitted he carried a 9 millimeter Colt handgun, and that Elmore had a gun as well. Ross went into the woods with Elmore and he admitted his intention was to shoot at Lyda and the other members of the group.

{¶13} Once in the woods, Ross said he slipped down the hill and when he got up Lyda began firing at him and Ross returned fire. Ross's gun jammed and he sustained a gunshot wound from Lyda's gunfire. He then heard two shots coming from the woods behind him, where Elmore was standing. Ross said he believed that had additional shots not been fired from the woods after he was shot, he would have been killed.

{¶14} Joshua Barr from the Bureau of Criminal Identification and Investigation test-fired the firearm that was found in the woods and found it to be operable. There were seven spent cartridge cases found at the scene by police. Barr determined that the cartridge cases were fired from two different guns, but that none of them came from the firearm found at the scene.

{¶15} Detective John Lelless of the Steubenville police department testified about his investigation. He first spoke to Elmore about the crime two months after the shooting and asked Elmore: " 'Do you want to know what this is about?' And he [Elmore] stated yes. I told him and he said 'Well, you got me for complicity and running through the woods.' "

{¶16} The next day, Lelless interviewed Elmore and a video of that interview was played for the jury and admitted into evidence. Elmore relayed to Lelless that he

and Ross were on the porch that day when they saw Lyda and the others walk by. He said they were "on eggshells" because of prior altercations with the group. He saw Lyda "mean-mugging" him and grabbing at his waist. He claimed Lyda would have shot at them right then had it not been for two older ladies walking down the street at that same time. He talked to Ross and they agreed they had to do something. He said Ross was one of the select few that would shoot for him when he needed him to; he called him his "little shooter." Then the two went into the woods. Elmore said to Ross: "count to 5 when they walk past us and we gon' air 'em out," which he said meant to shoot at them. However, he said Ross "jumped the gun," slipped and started shooting. He said Ross got off 3 shots, his gun jammed and then he was hit with gunfire. Elmore said when he saw Ross get shot, he realized he needed to cover him, so he shot three times, "pow, pow, pow." On the video he demonstrates shooting straight ahead. Elmore left his gun in the woods. He admitted he immediately started looking for another gun after the incident so as not to be unarmed for long.

{¶17} Elmore presented the testimony of Holly Brown, who lived in the area of the shooting. She identified Elmore as the man she saw pointing a weapon that day. But she conceded she identified another man in a photo array soon after the shooting. Patrolman Jon Sowers confirmed that both Brown and her husband selected someone other than Elmore from arrays, but conceded on cross that Elmore was not pictured in those arrays.

{¶18} Elmore then chose to testify in his own defense against the advice of counsel. He admitted he and Ross planned to shoot at Lyda, but claimed he had a change of heart at the last minute. He admitted he fired his gun, but claimed he fired it in the air as "cover shots" to protect Ross, who had just been shot.

{¶19} After considering all of the evidence, the jury found Elmore guilty as charged of one count of felonious assault, R.C. 2903.11(A)(2), a second-degree felony, with an attached firearm specification, R.C. 2941.145, and one count of weapons under disability, R.C. 2923.13(A)(3), a third-degree felony.

**{¶20}** Following a hearing, the trial court sentenced Elmore to eight years for the felonious assault, 3 years on the firearm specification and 3 years on the weapons under disability, to be served consecutively for a 14 year aggregate sentence. The court imposed 3 years of mandatory post-release control and explained the ramifications of violating post-release control.

## Manifest Weight

**{¶21}** In his first of two assignments of error, Elmore asserts:

The jury verdict of guilty to the offense of felonious assault was against the manifest weight of the evidence.

**{¶22}** "Weight of the evidence concerns the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other." (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. *Id.* This is so because the triers of fact are in a better position to determine credibility issues, since they personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶23}** Thus, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. However, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99 CA 149, 2002–Ohio–1152, *2, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Under these circumstances, the verdict is not against the manifest weight and should be affirmed.

**{¶24}** Elmore challenges his felonious assault conviction, pursuant to R.C. 2903.11(A)(2), which provides: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *."

**{¶25}** "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). Physical harm means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). R.C. 2923.11(A) defines a "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

**{¶26}** In addition, the complicity statute is relevant here:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

    (1) Solicit or procure another to commit the offense;

    (2) Aid or abet another in committing the offense;

    (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code; * * *

(C) No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of section 2923.02 of the Revised Code.

R.C. 2923.03(A)(1)-(3) and (C).

**{¶27}** R.C. 2923.03(F) also provides: "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." The Ohio Supreme Court held that this subsection "adequately notifies defendants that the jury may be instructed on

complicity, even when the charge is drawn in terms of the principal offense." *State v. Hand*, 107 Ohio St.3d 378, 2006–Ohio–18, 840 N.E.2d 151, ¶ 181, citing *State v. Keenan*, 81 Ohio St.3d 133, 151, 689 N.E.2d 929 (1998), citing *Hill v. Perini*, 788 F.2d 406, 407–408 (6th Cir.1986).

**{¶28}** Elmore's conviction is not against the manifest weight of the evidence. To the contrary, there was overwhelming evidence of his guilt either under a complicity theory or with Elmore as the principal offender. Multiple witnesses clearly described seeing Elmore and Ross standing on the porch, explained the ongoing conflict between the two gangs and described the shots fired from the wooded area. Although they did not see Elmore shooting, they saw him in the woods with Ross during the shooting and testified there was continued shooting after Ross went down. There was also testimony that they could hear shots from what sounded like two different guns.

**{¶29}** Ross testified he went into the woods with Elmore and he admitted his intention was to shoot at Lyda and the other members of the group. After Ross sustained a gunshot wound, he then heard two shots coming from the woods behind him, where Elmore was standing.

**{¶30}** Detective Lelless testified that when he spoke to Elmore about the shooting and asked him: " 'Do you want to know what this is about?' that [Elmore] stated yes and told him 'Well, you got me for complicity and running through the woods.' "

**{¶31}** In addition to the witness testimony, Elmore's interview with Det. Lelless, which was played for the jury at trial, is quite probative of his guilt. On this interview he states Ross was one of the select few that would shoot for him when he needed him to; he called him his "little shooter." He admitted the two went into the woods with the intention of ambushing the other group. According to Elmore, he said "count to 5 when they walk past us and we gon' air 'em out," which he said meant to shoot at them. However, he said Ross "jumped the gun," slipped and started shooting. He said Ross got off 3 shots, his gun jammed and then he was hit with

gunfire. Elmore said when he saw Ross get shot, he realized he needed to cover him, so he shot three times, "pow, pow, pow." On the video he demonstrates shooting straight ahead.

{¶32} Finally Elmore chose to take the stand—against the advice of counsel—to tell "his side of the story." He clearly described the two groups of men and the stare-down that occurred as they encountered one another. Elmore conceded that he is not the type of individual who is going to report a problem to the police, but rather, he is likely to take matters into his own hands. He stated: "We - - we tend to take -- I don't want to say justice into our own hand but we - - we just tend to take matters into our own hand as far as protecting our lives out there on a daily basis, you know. Not everybody out there is working 9 to 5s or - - or just law-abiding citizens, you know what I'm saying."

{¶33} He described the incident as follows in his own words: "They flex on us. I asked -- I asked William Ross what he want to do. He said 'Let's go.' Me, I'm -- I'm already registered. I already got shot at. I got jumped by these dudes. I'm I'm not about to keep tolerating it." Elmore said "[m]y intentions was to go down there and - - and cause harm to these dudes but I didn't. At the last minute I choked up." He said the only shots he fired were "cover shots" into the air as a warning after Ross was shot. (*Id.*)

{¶34} However, upon cross-examination, he admitted that he and Ross conspired to shoot Lyda and that the two of them worked together as a pair by tracking the other group of young men and then hiding in the woods, planning to let them walk by before shooting them in the back:

> Q     Okay. Once they walk past you on Oakmont you're still standing on this porch with your friends; correct?
>
> A     Yes, ma'am. * * *
>
> Q     They walk past you.
>
> A     Uh-huh.
>
> Q     You're safe.

A      Yes, ma'am.

Q      And yet you decide, and I'm going by your words, Mr. Elmore -

A      Yes, ma'am.

Q      -- it's not -- you don't tell Detective Lelless that Will says we got to do something. You say that you've got to do something about this.

A      Yes, ma'am.

Q      When you just testified under oath right now you put that all on William Ross but that's not true; is it?

A      No, ma 'am.

Q      It's your idea to go stalk this man.

A      Yes, ma'am.

Q      In fact, the shoot-out just like you said -

A      No. I -- I -- it was both of ours, Mrs. Hanlin.

Q      All right. Like you said, the shoot-out would have happened right there in the middle of Jefferson Street with all those kids around except for the fact that there are two old ladies on the street; correct?

A      Yes, ma' am.

Q      Had it not been for them you would have shot this out right in the middle of the street?

A      I can't predict that.

Q      But you're smarter than that.

A      Yes, ma'am.

Q      So, you're not going to do it right when these little old ladies are going to see it. You're going to stalk him. You're going to go down in the woods and follow him; correct?

A      Yes, ma'am.

Q      You're going to ambush him

A      Yes, ma'am.

Q    And you take steps to do that. You leave the porch.

A    Yes, ma'am.

Q    You have a loaded weapon.

A    Yes, ma'am.

Q    Your friend William Ross has a loaded weapon.

A    Yes, ma'am.

Q    In fact, you say "We're the only two with straps" and that means you're the only two on the porch that had guns; correct?

A    Yes, ma'am.

     * * *

Q    Okay. Only you and Will are armed to the best of your knowledge.

A    Yes, ma'am.

Q    Only you and Will leave the porch.

A    Yes, ma'am.

Q    Only you and Will stalk that man through the woods.

A    Yes, ma' am.

Q    And only you say "We're going to count to 5 and then we are going to air it out."

A    Yes, ma'am.

Q    And when Detective Lelless asks you that means you are going to shoot till there's not any more ammunition left.

A    Yes, ma' am.

     * * *

Q    You say more than one time on that tape "Count to 5"

A    I understand what I said.

Q    -- "let them get by"; don't you?

A    Yes, ma'am.

Q    When asked why, just in case there was any doubt, you say "Because we are going to shoot him"; don't you?

A     Yes, ma'am.

      * * *

Q     You say William Ross is your toy soldier.

A     He's a fighter. That's any -- that's anybody you -

Q     Do you say that or not?

A     Yes, ma'am, I said it. I'm not denying it.

Q     Did you call him your Little Cowboy?

A     Yes, ma'am. I said it.

Q     Did you say you keep him around because he's one of the select few that you know will shoot?

A     Yes, ma'am.

Q     And then you engage him in a plan to go shoot another human being."

A     Yes, ma'am

      * * *

Q     Would you agree with me that the entire time that we're talking about the shooting on South Street, what's been played for this Jury, you never say you tried to talk him out of it?

A     Yes, ma'am.

{¶35} There was overwhelming evidence supporting the jury's guilty verdict with regard to the felonious assault charge. The jury did not lose its way convicting Elmore. Accordingly, Elmore's first assignment of error is meritless.

**Consecutive Sentence**

{¶36} In his second and final assignment of error, Elmore asserts:

The trial court committed reversible error in sentencing the defendant to fourteen (14) years in prison.

{¶37} This Court is currently split as to the standard of review to apply in felony sentencing cases. See *State v. Hill*, 7th Dist. No. 13 MA 1, 2014–Ohio–919

(Vukovich, J., Donofrio, J., majority with DeGenaro, J., concurring in judgment only with concurring in judgment only opinion), which applied the two-part test set forth in the plurality opinion in *State v. Kalish*, 120 Ohio St.3d 23, 2008–Ohio–4912, 896 N.E.2d 124, and *State v. Wellington*, 7th Dist. No. 14 MA 115, 2015–Ohio–1359 (Robb, J., DeGenaro, J., majority with Donofrio, J. concurring in judgment only with concurring in judgment only opinion) which applied R.C. 2953.08(G) and limited appellate review of felony sentences to determining whether they are clearly and convincingly contrary to law. The issue is currently before the Ohio Supreme Court. *State v. Marcum*, 141 Ohio St.3d 1453, 2015–Ohio–239, 23 N.E.3d 1453. Regardless of which standard of review is applied here, the outcome is the same

### *Bonnell*, R.C. 2929.41 and R.C. 2929.14(C)(4)

{¶38} In 1996, the Ohio General Assembly enacted a major statutory revision of felony sentencing, which, inter alia, limited judicial discretion regarding the imposition of consecutive sentences, establishing a presumption in favor of concurrent sentences. Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136, effective July 1, 1996. For more than a decade thereafter, constitutional challenges to Ohio's and similar statutes in other states were litigated—some initially successful, as in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470—but ultimately culminating with *Oregon v. Ice* and then *State v. Hodge*, which upheld statutes requiring judicial fact-finding prior to imposition of consecutive sentences. *Oregon v. Ice*, 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009), *State v. Hodge*, 128 Ohio St.3d 1, 2010-Ohio-6320, 941 N.E.2d 768, ¶ 19 (recognizing that "the decision in Ice undermines some of the reasoning in the Foster decision that judicial fact-finding in the imposition of consecutive sentences violates the Sixth Amendment.) Consequently, the Ohio General Assembly enacted Am.Sub.H.B. No. 86, effective September 30, 2011.

{¶39} As the Ohio Supreme Court recently acknowledged, the General Assembly enacted H.B. 86 "with a legislative purpose to reduce the state's prison population and to save the associated costs of incarceration by diverting certain

offenders from prison and by shortening the terms of other offenders sentenced to prison." *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, 664, ¶ 20, citing Ohio Legislative Service Commission, Fiscal Note & Local Impact Statement to Am.Sub.H.B. 86.

**{¶40}** Thus, following H.B. 86, R.C. 2929.14 and R.C. 2929.41 now govern our review of the trial court's decision to impose consecutive sentences.

**{¶41}** R.C. 2929.41 provides in pertinent part:

(A) Except as provided in division (B) of this section, division (C) of section 2929.14, or division (D) or (E) of section 2971.03 of the Revised Code, a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment imposed by a court of this state, another state, or the United States.

**{¶42}** R.C. 2929.14(C)(4) provides a trial court may impose consecutive sentences upon an offender if the court makes three statutory findings:

[T]hat the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the

multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

**{¶43}** The findings must be made both at the sentencing hearing and in the sentencing entry. *Bonnell* at ¶ 37. However, a trial court need not state reasons to support its findings nor is it required to use any "magic" or "talismanic" words, so long as it is apparent that the court conducted the proper analysis. *State v. Jones*, 7th Dist. No. 13 MA 101, 2014-Ohio-2248, ¶ 6. "Pursuant to *Bonnell,* this court must also determine whether the record contains evidence in support of the trial court's findings." *State v. Correa*, 7th Dist. 13 MA 23, 2015-Ohio-3955, ¶ 76, citing *Bonnell* at ¶29.

**{¶44}** In *Bonnell*, the defendant attempted to break into a vending machine and on three separate occasions thereafter did break into three others stealing approximately $117 in change and causing damage at all four locations; Bonnell was indicted on multiple felony counts but later plead to a reduced number of felonies and the State dismissed the balance in exchange for the plea. *Id.* at ¶ 6-8. The trial court imposed consecutive sentences based upon the following findings made by the trial court at the sentencing hearing:

The court: Going through all of the sentencing factors, I can not [sic] overlook the fact your record is atrocious. The courts have given you opportunities.

The defendant: Yes.

The court: On the PSI pages 4 through 16, it's pretty clear that at this point in time you've shown very little respect for society and the rules of society. The court feels that a sentence is appropriate.

*Bonnell* at ¶ 9.

**{¶45}** In reviewing this language, the Supreme Court held in *Bonnell* that the trial court made two of the three findings mandated by R.C. 2929.14(C)(4), but that it failed to make a proportionality finding:

> [T]he trial court had obviously reviewed the presentence-investigation report and knew of Bonnell's criminal record, because it described his record as atrocious and stated that he had shown very little respect for society. But the court did not completely adhere to R.C. 2929.14(C)(4).
>
> We can discern from the trial court's statement that Bonnell had "shown very little respect for society and the rules of society" that it found a need to protect the public from future crime or to punish Bonnell. We also can conclude that the court found that Bonnell's "atrocious" record related to a history of criminal conduct that demonstrated the need for consecutive sentences to protect the public from future crime. But it never addressed the proportionality of consecutive sentences to the seriousness of Bonnell's conduct and the danger he posed to the public, which in this case involved an aggregate sentence of eight years and five months in prison for taking $117 in change from vending machines.

*Bonnell* at ¶ 32-33.

**{¶46}** In some ways, the *Bonnell* opinion's generous reading of the trial court's limited statement seems incongruent with the General Assembly's clear intention to require trial courts to make the R.C. 2929.14(C)(4) findings to support the imposition of consecutive sentences in order to overcome the statutory presumption of

concurrent sentences. Still, the majority in *Bonnell* recognized the General Assembly enacted the statute to limit the trial court's discretion out of a policy decision to reduce the State's prison population and the attendant costs by shortening prison terms. *Id.* at ¶16, 20. *See also Id.* at ¶ 23 ("Thus, judicial fact-finding is once again required to overcome the statutory presumption in favor of concurrent sentences.") *Id.* at ¶23. "But," as the Court continued to state, "that statute [R.C. 2929.14(C)] does not specify where the findings are to be made." *Bonnell* at ¶28.

**{¶47}** Although *Bonnell* went on to state that " the record must contain a basis upon which a reviewing court can determine that the trial court made the findings required by R.C. 2929.14(C)(4) before it imposed consecutive sentences" (emphasis added), little guidance has been provided as to precisely where in the record those findings must be. This gives rise to multiple possibilities: the findings can be made at any point during the sentencing hearing, for example, even while simultaneously making findings pursuant to R.C. 2929.11 and .12, without being specifically tied to consecutive sentences; or they must be specifically tied to consecutive sentences, even if it is repetitive of findings the trial court is required to make pursuant to other sentencing statutes.

**{¶48}** As a result, we and our sister districts have been left to struggle with how to interpret and apply *Bonnell*. Do we give that case a broad interpretation with respect to how deferentially we review the trial court's findings; and if so, does that ignore the clear intent of the General Assembly for courts to impose shorter, rather than longer prison terms? The trend appears to be that appellate courts "have been fairly deferential to the trial court when reviewing the transcript of a sentencing hearing to determine whether the trial court has made the findings required by R.C. 2929.14(C)(4)[,]" in the wake of *Bonnell. State v. Hargrove*, 10th Dist. No. 15AP-102, 2015-Ohio-3125, ¶19.

**{¶49}** In *Hargrove*, the Tenth District recounted the trial court's sentencing colloquy, lengthier than that in *Bonnell*, which began with the trial court stating that consecutive sentences would be imposed because the offense was the most serious

and worst form of the offense, and then articulated specific facts explaining why. *Hargrove* at ¶13. The prosecutor also made reference to the R.C. 2929.14 disproportionality and course of conduct findings as well as R.C. 2929.41, which the trial court acknowledged. *Id.*

{¶50} The Tenth District affirmed the consecutive sentence order, discussing in detail the manner in which the trial court made the requisite statutory findings:

 * * * appellant acknowledges that the trial court "ostensibly" made the finding required by R.C. 2929.14(C)(4) that a consecutive prison term is "necessary to protect the public from future crime or to punish appellant." Appellant also states that the trial court "possibly" made the finding that appellant's "history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime" by appellant under R.C. 2929.14(C)(4)(c).  Our review of the transcript of the sentencing hearing leaves no question that the trial court made both findings when the trial court noted that appellant had been convicted of a similar crime in 2007 and that he continued to engage in the same criminal conduct after receiving a 15–month prison sentence. The trial court also found that appellant's criminal conduct in this case was "very offensive" and that he preyed on elderly victims who were sympathetic to injured veterans. (Jan. 9, 2015 Tr. 7.).

* * *

The trial court's finding that appellant's criminal conduct was the worst and most serious type punishable under R.C. 1716.14 is indicative of the requisite proportionality analysis. It stands to reason that when a sentencing court finds that an offender has engaged in the worst and most serious conduct prohibited by the law under which he was convicted, the sentencing court believes a consecutive prison term is

not disproportionate to the seriousness of the offense.

*Hargrove* at ¶ 14, 17. (footnote omitted.)

{¶51} Thus, like our sister districts, we are left to divine where in the record a trial court must make the findings required by R.C. 2929.14(C)(4) in order to impose consecutive sentences. It would appear that, despite some tension with the General Assembly's intentions, post-*Bonnell*, we may liberally review the entirety of the sentencing transcript to discern the findings.

### Elmore's Sentence

{¶52} Here, the three year sentence for firearm specification attached to Elmore's felonious assault conviction is mandatory; thus the question before us is whether the trial court made sufficient findings as contemplated by *Bonnell's* deferential standard to support consecutive sentences for the felonious assault and weapon under disability convictions. Additionally, Elmore challenges the trial court's imposition of maximum sentences. We will address these arguments in inverse order.

{¶53} During the sentencing hearing, the trial court thoroughly considered sentencing factors contained in R.C. 2929.11 and .12. The trial court found that the crime was made worse by the fact that the intent was to shoot the victims in the back, and was more serious because it took place in a residential neighborhood, around juveniles, and was part of an organized criminal activity. The trial court also found that Elmore lacked remorse, and even worse, that he considered himself a victim. The trial court also noted that "it bothers me and it's a serious sentencing factor" that Elmore was on post-release control at the time, having been released from prison only six months before the shooting. The trial court also found it troublesome that Elmore left a loaded weapon where anyone, including a child, could have found it, and that he immediately went to look for another gun, despite having a weapons disability. The court noted that Elmore's criminal record was repeated and long and included drugs but to Elmore's favor there was no history of violence. In sum, the trial court stated, "when I pile all this up it does appear to me as though the recidivism

factors are as bad as they can get and the nature of the offense, the only thing you have going for you is that you missed - - well your buddy missed and you missed too. So, by accident you didn't kill anybody but that's really all you have going for you."

{¶54} Thus, the trial court did not err by imposing maximum sentence. The trial court then went on to impose consecutive sentences stating as follows:

> So, I guess what we're looking at is for the felonious assault we're doing 8 years. For the mandatory firearm specification we're doing another 3. And for the weapons under disability, especially after this you leave it where some kid can find it and then you go looking for another one. You're getting 3 on that one too. So, if I added these up right it's 14 years, the first 3 of which are mandatory.

{¶55} As demonstrated by the record, although the prosecutor requested consecutive sentences, nowhere in the sentencing transcript does the trial court mention the words consecutive sentences; instead, it merely states that the three sentences add up to 14 years. As recounted above, the trial court did make findings which comport with both subpart (a) and (c), which are two of the three options which comprise the third statutory finding. Specifically, the trial court found that Elmore was under post-release control when he committed the offenses. *See* R.C. 2929.14(C)(4)(a). The trial court's finding that Elmore's criminal record was "repeated and long" and that it took place in a residential neighborhood, around juveniles, and was part of an organized criminal activity could constitute a finding that the "offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." R.C. 2929.14(C)(4)(c).

{¶56} The facts of this case afford us the analytical opportunity to note that the statute itself has articulated separate, yet slightly repetitive findings, to wit, the necessity to protect the public. *Compare* R.C. 2929.14(C)(4)(c), quoted directly

above, with R.C. 2929.14(C)(4), the first required finding: "consecutive service is necessary to protect the public from future crime or to punish the offender."

**{¶57}** It could be argued that one finding is directed at protecting the public from future crime in general, as articulated by the first required finding, whereas the third finding contemplates the deterrent effect as to a particular offender. However, this may be a subtle distinction without a difference as a practical matter, given the deferential interpretation of these two statutory findings by the Ohio Supreme Court in *Bonnell.* Thus, we conclude that the trial court's statement here satisfied both findings.

**{¶58}** However, under even the most generous reading, the trial court failed to make a finding that consecutive sentences is not disproportionate to the seriousness of Elmore's conduct and to the danger he poses to the public. R.C. 2929.14(C)(4). These words were used with intent by the General Assembly. Inherent in the proportionality finding is that a trial court engage in a weighing process, comparing or balancing these two factors, which it stands in the best position to do. An appellate court on review could scour the record for findings which satisfy this requirement, but if the record fails to demonstrate that the trial court actually weighed these factors, then reversal is required. Here, there is nothing in the record before us demonstrating the trial court did that; in fact, prior to the imposition of Elmore's sentence, the trial court never uses the term consecutive sentence.

**{¶59}** And even though *Bonnell* advocates deference when reviewing the trial court's findings, there are limits to that deference, as demonstrated by the outcome of *Bonnell.* The Supreme Court reversed and remanded Bonnell's sentence because the trial court failed to make a proportionality finding. *Bonnell* at ¶ 33-34. In *Bonnell,* as in this case, the trial court made no reference whatsoever to consecutive sentences, it referred instead to "a sentence." *Bonnell* at ¶ 9 (quoting the trial court.) And where an offender is convicted of multiple offenses, his or her sentence in the global generic sense, can be comprised of either concurrent, consecutive or a combination, of discrete sentences imposed for each discrete charge. Thus, the

General Assembly limited a trial court's discretion to impose consecutive sentences and override the presumption in favor of concurrent sentences, by requiring that the trial court weigh the proportionality/seriousness factors. And the Ohio Supreme Court reaffirmed this policy choice in *Bonnell* by remanding that case for resentencing because the record demonstrated that the trial court there failed to weigh those factor, even under the deferential review standard articulated in *Bonnell.*

**{¶60}** Taking all this into account, the trial court's statement during the sentencing hearing in this matter does not comport with the requirements of R.C. 2929.14(C)(4) because it failed to make the proportionality finding.

**{¶61}** And although the trial court did make the required findings in the sentencing entry, that is insufficient. As explained by the Court in *Bonnell*, a nunc pro tunc entry cannot correct a deficiency in the sentencing hearing with regard to consecutive sentence findings. *Bonnell* at ¶30. Accordingly, Elmore's second assignment of error is meritorious.

**{¶62}** In sum, the jury did not lose its way in convicting Elmore of the felonious assault charge; there was overwhelming evidence of his guilt. However, the trial court erred by failing to make all the statutorily required findings relative to consecutive sentences during the hearing. Accordingly, the conviction is affirmed, the sentence is vacated and the matter is remanded for resentencing.

Donofrio, P. J., concurs.

Robb, J., concurs.