[Cite as *State v. Fong*, 2025-Ohio-1580.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-24-1038

    Appellee                                Trial Court No. CR0202302405

v.

Thomas Fong                                **DECISION AND JUDGMENT**

    Appellant                               Decided: May 2, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Jon D. Richardson, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Thomas Fong, appeals from a judgment entry of the Lucas

County Court of Common Pleas sentencing him to consecutive sentences following his

pleas of guilty to charges of practicing medicine without a license and sexual imposition. For the reasons that follow, we affirm the judgment of the trial court.

## Statement of the Case and the Facts

### A. The indictments.

{¶ 2} **CR-23-2091.** On July 19, 2023, appellant was indicted on three counts of practicing medicine without a license or certificate in violation of R.C. 4731.41(A) and R.C. 4731.99(A), each a felony of the fifth degree (Counts 1-3), and two counts of sexual imposition in violation of R.C. 2907.06(A)(1) and (C), each a misdemeanor of the third degree (Counts 4, 5).

{¶ 3} **CR-23-2405.** On September 12, 2023, appellant was indicted on one count of practicing medicine without a license or certificate in violation of R.C. 4731.41(A) and R.C. 4731.99(A), a felony of the fifth degree (Count 1), and one count of sexual imposition in violation of R.C. 2907.06(A)(1) and (C), a misdemeanor of the third degree (Count 2).

### B. The January 31, 2024 combined plea hearing.

{¶ 4} In case No. CR-23-2091, appellant entered an *Alford* guilty plea to Counts 1 through 4, and the State agreed to enter a nolle prosequi as to Count 5 at sentencing. The court accepted appellant's plea and found him guilty of the four offenses.

{¶ 5} In case No. CR-23-2405, appellant entered an *Alford* guilty plea to both counts charged. The court accepted appellant's plea and found him guilty of the two offenses.

2.

**C. The February 12, 2024 combined sentencing hearing.**

{¶ 6} At sentencing, defense counsel was first to address the court. Counsel acknowledged that there were times when appellant "did recklessly breach certain protocols," which made the victims "uncomfortable" and feel "as if they were being taken advantage of," but he insisted that appellant never meant to hurt anyone and that any discomfort the victims felt was unintended. Counsel further emphasized that appellant's "protocol breaches" were not committed "for any personal reasons." Defense counsel also stated that appellant was 69 years old and had no prior criminal record. Finally, counsel suggested that registration as a Tier I sex offender was "plenty of punishment."

{¶ 7} Following defense counsel's remarks, the trial court took note of appellant's previously-filed sentencing memorandum and letters from friends and family that attested to appellant's good character, but stated that "[these mitigating factors] only go so far. You have that scale that you are balancing, and you are putting bricks on one side and feathers on another side it seems to be a little bit difficult at times."

{¶ 8} Appellant himself addressed the court next. He began by apologizing to the State Medical Board and then attempted to explain that he failed to renew his license (when renewal was initially due in 2003) because he had been taking care of his girlfriend for two years and he did not realize it had expired. He also claimed that he could not afford the fee.

3.

{¶ 9} Appellant next apologized to the City of Toledo and "all the massage therapists in town." He lamented the damage to his own reputation and then apologized to his clients. Finally, appellant apologized to "the accuser" and insisted that he did not mean to cause any harm.

{¶ 10} Victim A.T. delivered the first victim impact statement, stating that appellant was "no innocent elderly man," and that all of his crimes involved manipulating vulnerable women who were at the lowest points of their lives, "grooming us to trust him until he could get his hands on us." She opined that appellant "is a true predator," who, given the opportunity, would continue to offend.

{¶ 11} A.T. explained that she had been diagnosed with lymphoma when she was 24 years old, which required her to spend nearly nine months in treatment undergoing multiple surgeries, eight rounds of chemotherapy, and nearly a month of daily radiation. A.T. described those nine months of treatment as "devastating." The chemotherapy made it difficult for her to remain conscious. She required infusions of fluid almost every day. She suffered from hallucinations and pervasive nausea, with resulting nose bleeds. There were times when she had to be carried because she could not walk, and times when she struggled to speak. A.T. said that "[i]t was a lonely and grueling battle to find the will to live."

{¶ 12} It was around this period that A.T. met appellant at a cancer wellness center where she was going to receive free care in the form of massages, support groups for young cancer victims, and reiki treatments. A.T. described her sickly appearance at the

time, stating "[m]y cheek bones were hollowed out, and veins were protruding from my face. There were permanent bags under my eyes. There was a port placed in my chest for infusions, … my head was shaved, and I had patchy bald spots all over." She said, "[T]hat is the woman that appellant [preyed] on, whom he planned to manipulate so he could get close enough to touch my body."

{¶ 13} A.T. explained that appellant performed reiki on her four times and that he used the personal information he found in her chart to "weasel his way into [her] life and more." In her final reiki session with appellant, A.T. "broke down and cried to him" because she was terrified that her cancer would relapse.

{¶ 14} At that time, she was still in a lot of physical pain and fatigued from the radiation treatments. She stated that her chest was burned and that when she breathed, it felt like glass shards in her lungs.

{¶ 15} A.T. stated that she "was in the single most vulnerable state of [her] life." She stated that appellant "harbored on" her fears and told her after the reiki session that she had "an issue festering" on the right side of her chest, striking fear in her that the cancer had relapsed and spread. A.T. said that appellant also told her that her "emotional pain was manifesting physically in [her] body." That is when appellant told her that he was a certified massage therapist with many years of experience. He offered to give her a free energy reading and a lymphatic massage at La Luna Salon and Spa, where he worked.

5.

{¶ 16} A.T. told the court, "I would have never gone if I hadn't looked it up and saw that it was a legitimate spa where [appellant] was on staff and mentioned online as a care provider with many years of experience and a license." A.T. later learned that La Luna was owned by appellant's sibling, who "enabled him" to practice without a license.

{¶ 17} A.T. described appellant as "pushy." He insisted on seeing her for a massage the next day. He specifically instructed her to text him when she arrived and not to go through reception.

{¶ 18} A.T. described this first appointment at La Luna. Appellant began her treatment with an "energy reading," after which he insisted that A.T.'s "breast tissue was carrying anger and pain, especially [her] right breast." A.T. explained that she thought appellant meant that the issue was with the tissue around the area where her port had been removed, which was on the right side of her chest. Because the port had been recently removed, it was irritated, red, and oozing from the stitches that were holding the wound together. Before the massage, A.T. asked appellant to avoid her port wound, because it was still painful and sore, and she was concerned that the massage oil might cause it to become infected.

{¶ 19} Appellant disregarded A.T.'s concerns and insisted that he knew how to do oncology massages. In the end, he got oil "all over" the open wound, which caused the area to become infected.

{¶ 20} A.T. next described the events that made her feel like she had been molested by appellant, stating:

6.

Now, I wish I trusted my intuition and I saw the signs, his insisting that I take my underwear off, the room being way too dark, me noticing that his laptop with his web cam was still up when I was getting undressed. I wondered briefly if he was taking pictures or secretly recording me changing, but then I felt guilty that I had accused him in my mind, an innocent old man who was doing me a huge favor.

There were so many weird parts, but I was so afraid of offending him or angering him, and I was in such a vulnerable state that I just stayed.

Tom spent an unnecessary amount of time around my chest, stomach and genital areas constantly pulling the sheets down, or over too much and exposing the top or side of my vagina and my boobs.

At one point he brushed my pubic bones so many times I shuttered [sic], and I remember that specifically. When massaging my legs he was centimeters from the opening of my vagina rubbing his hands beneath where even my underwear would have been on my legs.

I was afraid that with every stroke he would put his hands inside of me.

When he massaged my neck and shoulders he kept inching closer and closer to my boobs before putting his hands right on them, touching and massaging them, brushing my nipples multiple times.

I tried to think of excuses for him, like maybe he couldn't see well, or maybe he knew lymphatic massages in a way I had not experienced before. I had never been massaged by a man and maybe I was imag[in]ing all of it.

At this point I completely froze and was clenching my fists on the side of the table and squeezing my eyes shut. I thought of anything I could do to make up an excuse to leave, but I could not get the words out of my body as he continued to touch me.

I completely shut down. When the massage was over and he left the room I staggered to get my clothes, and I put them on as fast as I could. He made a weird comment about how I should stop wearing a head scarf because I looked prettier without one. And obviously that made me extremely uncomfortable.

{¶ 21} A.T. concluded her statement by requesting the court to impose the maximum sentence.

{¶ 22} Victim A.S. presented a second victim impact statement. Like A.T., A.S. met appellant when she was in a "very emotional state." She was introduced to him over a phone call, but would later discover that appellant had already known who she was, and of the past trauma she had suffered, for more than six years. Although appellant knew all about her trauma, he did not disclose this fact to her.

{¶ 23} In an effort to process her trauma, A.S. had scheduled some time away from work to travel to a wellness retreat in Costa Rica. Appellant convinced A.S. that if she could manage to see him for at least three three-hour appointments before she left for her trip, she would feel better both physically and mentally, which would allow for a better outcome at the retreat.

{¶ 24} A.S. told the trial court that appellant's "MO" is to convince women that "the physical pain that they are experiencing from emotional trauma is manifesting itself as pain and that their lymph nodes are storing all of this toxic trauma." She stated that "[appellant] tells women that they need lymphatic drainage so that he can touch them in the way and in places that he wants to touch them, because many of the lymph nodes are

8.

in intimate areas such as the breast, underarms, and groin area," and that this was consistent with both herself and A.T., whom appellant had victimized an entire year before A.S. even met him.

{¶ 25} A.S. described one of her lymphatic drainage treatment sessions with appellant. As with A.T., appellant made sure A.S. removed her underwear. Herself trained in lymphatic drainage, A.S. stated that appellant's techniques were unfamiliar to her. She additionally opined that appellant had not been formally trained in "energy work," because her discomfort with what appellant was doing to her resulted in tension so great "that you could cut the air in that treatment room with a knife." She stated that appellant is "definitely not an energy worker. He is a con-artist and a predator."

{¶ 26} A.S. stated that she gripped the sides of the massage table as appellant "pulled the covers down while pressing his penis into the back of [her] hand." She further stated that he kept touching her pubic bone "as if he was measuring for something." Also, "[h]e continually fluffed the covers as you might do if you were trying to get the wrinkles out of a bed sheet, but really it was because he was trying to look at my naked body."

{¶ 27} Appellant began to ask A.S. questions about her past trauma, and when she started to cry he started touching her nipples. A.S. said that the session finally ended with her in tears. Appellant sat at the head of the table and leaned down. With his right cheek nearly touching A.S.'s left cheek, "he hovered…for what felt like an eternity," and then he kissed her on the cheek and thanked her for sharing her story with him.

9.

**{¶ 28}** Like A.T., A.S. suspected that appellant was either photographing her or otherwise recording a video of her during the session. And like A.T., A.S. specifically recalled that appellant wanted the room very dark and that he left his laptop open on the counter during each session.

**{¶ 29}** A.S. concluded her statement by asking the court to impose the maximum sentence.

**{¶ 30}** The trial court began its comments with the following statement:

> Well, as many of you know when I go through cases like this some of the delay is the sifting and sorting, if you will, the unpacking as we talk about of what we're dealing with here today.
>
> And then you also would know that I do things very specifically and purposely such as verify four separate dates, one date for [A.T.], three separate and individual dates for [A.S.].
>
> And then I look at the factual elements that are alleged in the actual charges, not necessarily everything that happened, but what happened in a holistic way that resulted in the specific charges that the Court has.
>
> So as I'm looking at this, I'm dealing with three cases of – four charges of practicing medicine without a license or a certificate, which is a very technical aspect brought by the State of Ohio requiring sentencing – I'm sorry, licensure, and violation of that can result in sentencing.
>
> The very important parts here are that there's no license since 2003. These – the two individuals that I heard from today, these ladies were going through difficult times, and their times were at the lowest point in life and the lowest point in their medical care.

Licensing seems to be necessary and appropriate when dealing with individuals who are faced with the concerns that they have on a medical basis including if there's alternative therapy that can help from – a separation from a hospital setting and a medical diagnosis to any of the branches such as Mr. Fong was engaged in.

Yet at this time the advantages that were taken were at the lowest part of [A.T.] and [A.S.'s] lives, and as we heard here in the detailed presentation, the vulnerabilities that were – potentially could be protected by proper licensure if the licensure was required to be renewed once a year, biannual, does not really matter?

The fact is a licensing requirement at some point could have uncovered part of this, but certainly licensing requirements led to the victimization of [A.T.] and [A.S.].

So I have done sifting. I have done sorting, and unpacking of all of this. It does come down to the stories we heard today are directly related to the practicing of medicine without licensure and/or certificate.

As much as they are technical charges and there is a portion of what we heard today that is an impact, the impact and the charges are directly related.

So the Court has no problem looking at these as the emotional outlay of the events here today by the victims are directly related to the practicing of medicine without licensure or certificate.

So I do find that the charges are directly related as the Court considers the impact of the victims' statements in consideration of what is the appropriate sentencing here today.

So, Mr. Fong, on today's date your sentencing hearing held pursuant to 2929.19. Defendant was afforded all of his rights pursuant to Criminal Rule 32. The Court has considered the record, the oral statements, the victim impact statements, the

> pre-sentence reports, as well as the principles and purposes of sentencing under 2929.11.
>
> I've also balanced the seriousness and recidivism factors under 2929.12.
>
> I have considered the factors set forth in 2929.13B [sic]….

{¶ 31} After detailing the charges to which appellant pled, the trial court noted that the harm described by victims [A.T.] and [A.S.] "falls squarely within the definition of physical harm."

{¶ 32} Finding that appellant's conduct "was in violation of public trust," the trial court went on to state:

> …I do find that his behavior and his pattern of conduct does not adequately reflect and is appropriate to consider when considering whether or not to put a community control sanction or a prison sanction.
>
> [Defense counsel], you make very compelling arguments, but as I indicated earlier when the scale of justice has bricks being placed on it on one side and feathers on the other side there is no real comparison, and that is what happened here.
>
> The behavior of Mr. Fong is in complete disregard for the appropriate care of his patients. It is despicable conduct in the first place that only weighs in for a certain amount, but the disregard of his patients and as it relates to the registration he's a Tier I offender, but under the circumstances if the old considerations were being put in place I do believe that there's a strong argument that the State could make that he would qualify as a sexual predator.
>
> Taken the legal impact out of that that certainly fits on a more general basis as a culture of society Mr. Fong is simply that in these situations with these health concerns, the – the depth of what [A.T.] and [A.S.] described as far as the despair, and the

12.

situations they were in, and the conduct of Mr. Fong totally ignoring that does call for the prison sanction that will be placed.

As relates to CR 23-2091 Defendant is ordered to serve 10 months as to Count 1, 10 months as to Count 2, and 10 months as to Count 3. Count 4, 60 days at CCNO will be concurrent to Counts 1, 2, and 3 which are ordered consecutive.

As to CR 23-2405, Count 1, in that charge is 11 months, Count 2, 60 days. The 60 days will run concurrent to the 11 months of CR – I'm sorry, Count 1 in that case.

[T]he charges in both cases CR23-2091 as well as CR23-2405 are run consecutive. The Court does make the requisite findings that the harm caused was so great or unusual that no single prison term for any of the offenses committed as any part of – and this is important – the courses of conduct would adequately reflect the seriousness of the offender's conduct. I do find that there is a specific course of conduct.

[A.S.] suffered the consequences of three individual acts specifically woven together over time, and that is a course of conduct for this Court.

Also [A.T.], on a completely separate date, and obviously a completely separate individual, suffered her victimization as on a completely separate date.

Therefore – and I've spent time on this – the course of conduct for any of the single sentences would not adequately reflect the seriousness of his conduct. Therefore the Court orders the sentences consecutive for the two cases as well as Counts 1, 2, and 3 in case number CR 23-2091.

{¶ 33} The journal entry memorializing appellant's sentence in case No. CR-23-2091 and the journal entry memorializing appellant's sentence in case No. CR-23-2405 each specify that consecutive sentences "are necessary to protect the public from future

13.

crime or to punish the offender and are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and that "the harm caused was great or unusual such that no single prison term is adequate."

**Assignments of Error**

{¶ 34} On appeal, appellant asserts the following assignments of error:

I. The trial court failed to make all of the required findings under O.R.C. §2929.14(C)(4) at the sentencing hearing.

II. The trial court's imposition of consecutive sentences under O.R.C. §2929.14(C)(4) was not clearly and convincingly supported by the record and contrary to law.

**Law and Analysis**

{¶ 35} In this appeal, both of appellant's assignments of error challenge the trial court's imposition of consecutive sentences.

R.C. 2929.14(C)(4) provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 36} "Although the trial court is required to make the requisite findings both at the sentencing hearing and in the sentencing entry, it is not obligated to state reasons in support of its findings." *State v. Schaus*, 2024-Ohio-1515, ¶ 13 (6th Dist.), citing *State v. Jones*, 2024-Ohio-1083, ¶ 11, citing *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. "'Nor is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry.'" *Jones* at ¶ 11, quoting *Bonnell* at ¶ 37.

{¶ 37} Thus, an appellate court considering whether the trial court has made the requisite findings must view the trial court's statements on the record "in their entirety" to reveal an indication that the court made the necessary findings under R.C. 2929.14(C).

15.

*State v. Bates*, 2024-Ohio-2587, ¶ 30 (8th Dist.), citing *State v. Blevins*, 2017-Ohio-4444, ¶ 21, 23, 25 (8th Dist.).

**{¶ 38}** The trial court need not be articulate in making those findings. If the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld. *Bates* at ¶ 30, citing *State v. Bonnell*, 2014-Ohio-3177, ¶ 29.

**{¶ 39}** As a reviewing court, it need only be clear to us from the record that the trial court engaged in the appropriate analysis. *State v. Long*, 2015-Ohio-920, ¶ 7, citing *State v. Wright*, 2013-Ohio-5903, ¶ 33.

### 1. First Assignment of Error.

**{¶ 40}** In his first assignment of error, appellant argues that the trial court, at the sentencing hearing, failed to make several of the findings required under R.C. 2929.14(C)(4).

### The First Finding under R.C. 2929.14(C): Protect the Public or Punish the Offender

**{¶ 41}** First, appellant claims there is nothing in the sentencing transcript to demonstrate that the trial court made the first finding under R.C. 2929.14(C), that consecutive sentences were necessary to protect the public from future crime or to punish the offender.

16.

{¶ 42} This is a disjunctive finding. The trial court need only find that consecutive sentences in this case were necessary to protect the public from future harm *or* punish the offender.

{¶ 43} The focus should be on whether the trial court performed the required analysis and made appropriate conclusions. *See State v. Gessell*, 2020-Ohio-403, ¶ 12 (6th Dist.), citing *State v. Polhamus*, 2014-Ohio-145, ¶ 30.

{¶ 44} The trial court opined at sentencing:

> The fact is a licensing requirement at some point could have uncovered part of this, but certainly licensing requirements led to the victimization of [A.T.] and [A.S.].

{¶ 45} The trial court further considered appellant's pattern of behavior:

> I do find that his behavior and his pattern of conduct does not adequately reflect and is appropriate to consider when considering whether or not to put a community control sanction or a prison sanction.
>
> …
>
> The behavior of Mr. Fong is in complete disregard for the appropriate care of his patients.

{¶ 46} Finally, the trial court noted the multiple victims in this case, [A.T.], [A.S.], Ms. M., and Ms. D., two of whom spoke at sentencing.

{¶ 47} Here, the transcript indicates that the trial court did engage in the appropriate analysis under the first prong of R.C. 2929.14(C) to support a finding that consecutive sentences were necessary to punish appellant, notwithstanding the fact that the court did not use this explicit language which was ultimately incorporated into the sentencing judgment entry.

17.

## The Second Finding under R.C. 2929.14(C): Proportionality and Danger to the Public

{¶ 48} The court must also find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger posed to the public.

{¶ 49} Unlike the first finding, this is a necessary conjunctive finding. In his appeal, appellant does not argue that the consecutive sentences are disproportionate to the seriousness of the offender's conduct. Rather, he argues that the trial court failed to find that consecutive sentences are not disproportionate to the danger appellant posed to the public. Nevertheless, the trial court must make the findings at sentencing.

{¶ 50} The statutory scheme circumscribes an appellate court's review of a trial court's proportionality finding. The proportionality requirement is phrased in the negative; R.C. 2929.14(C) does not require that the trial court find that consecutive sentences are proportionate to the seriousness of the defendant's conduct and the danger he poses to the public before it may impose consecutive sentences. Instead, it requires that the trial court find that consecutive sentences "are not disproportionate" to the defendant's conduct and the danger he poses. *State v. Glover*, 2024-Ohio-5195, ¶ 52, *recon. den.*, 2024-Ohio-5629.

{¶ 51} The proportionality prong, however, focuses on the defendant's current conduct. The reference to the "offender's conduct" is to the conduct for which the defendant is being sentenced. A defendant's criminal history is dealt with separately as

18.

one of the three possible findings under R.C. 2929.14(C)(4)(a) through (c) that must also be made to impose consecutive sentences. To make a defendant's criminal history a required part of the proportionality finding would render R.C. 2929.14(C)(4)(c) superfluous.

{¶ 52} In our review, there must be an indication that the trial court's statements at sentencing would demonstrate that an analysis was made that appellant's consecutive sentences are not disproportionate to the defendant's conduct *and* the danger he poses.

{¶ 53} The trial court noted significantly:

> The very important parts here are that there's no license since 2003. These – the two individuals that I heard from today, these ladies were going through difficult times, and their times were at the lowest point in life and the lowest point in their medical care.

{¶ 54} A trial court's proportionality analysis does not occur in a vacuum. *State v. Johnson*, 2023-Ohio-2008, ¶ 35 (6th Dist.). Here, although not explicitly stating it was conducting an analysis in relation to consecutive sentencing findings, the trial court extensively considered the circumstances of appellant's current conduct in determining that sentences were warranted.

{¶ 55} The trial court further observed:

> The behavior of Mr. Fong is in complete disregard for the appropriate care of his patients. It is despicable conduct in the first place that only weighs in for a certain amount, but the disregard of his patients and as it relates to the registration he's a Tier I offender, but under the circumstances if the old considerations were being put in place I do believe that

there's a strong argument that the State could make that he
would qualify as a sexual predator.

{¶ 56} These statements obviously indicate an analysis of appellant's conduct and whether the imposition of consecutive sentences was disproportionate to the seriousness of his conduct and to the danger that he posed to the public. The trial court clearly considered appellant's conduct to be sexually predatory behavior. Sexual predators pose a high risk to engage in the future in one or more sexually oriented offenses and the protection of members of the public from sexual predators is a paramount governmental interest. *See State v. Collins*, 1999 WL 455335, *2 (3d Dist. June 29, 1999).

{¶ 57} If the trial court simply rephrased its statements by labeling appellant's behavior as sexually predatory given the multiple victims over a lengthy timeframe, it would indicate a more eloquent and lucid analysis under R.C. 2929.14(C)(4). Nevertheless, the sentencing transcript, when viewed in its entirety, indicates that the trial court considered proportionality with regard to both the seriousness of appellant's conduct and the danger that he posed to the public.

### Final Finding under R.C. 2929.14(C)(4)(b)

{¶ 58} Finally, the trial court must additionally make one of the findings described in R.C. 2929.14(C)(4)(a), (b), or (c). In this case, the only subsection applicable to appellant is (b), which states:

> At least two of the multiple offenses were committed as part
> of one or more courses of conduct, and the harm caused by
> two or more of the multiple offenses so committed was so

20.

great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

{¶ 59} Various appellate courts have acknowledged there is a high degree of overlap between a proportionality finding under R.C. 2929.14(C) and a finding under R.C. 2929.14(C)(4)(b) regarding the seriousness and severity of harm caused by an offender's conduct. *State v. Contes*, 2024-Ohio-2580, ¶ 17 (8th Dist.), quoting *State v. Bland*, 2020-Ohio-4662, ¶ 20 (10th Dist.).

{¶ 60} Thus, in the appropriate context, a trial court's findings may be applicable to more than one statutory requirement. *State v. Harnish*, 2025-Ohio-431, ¶ 15-17 (11th Dist.) (finding a high degree of overlap between a proportionality finding under R.C. 2929.14(C) and a finding under R.C. 2929.14(C)(4)(b)).

{¶ 61} At sentencing, the court noted the numerous victims, and that "each of the two separate counts involve at least one sex offense."

{¶ 62} The court also stated at sentencing:

…everything described here today by each [A.T.] and [A.S.] falls squarely within the definition of physical harm.

Also, was in violation of public trust.

{¶ 63} Therefore, in consideration of the overlapping factors stated at sentencing by the trial court under R.C. 2929.14(C) and R.C. 2929.14(C)(4)(b), there is an indication that the court undertook an appropriate analysis to make a finding under R.C. 2929.14(C)(4)(b).

21.

**{¶ 64}** For all of the foregoing reasons, appellant's first assignment of error is found not well-taken.

### 2. Second Assignment of Error.

**{¶ 65}** Appellant argues in his second assignment of error that the imposition of consecutive sentences "was not clearly and convincingly supported by the record" and was contrary to law.

### The Record Supports the Findings

**{¶ 66}** While our review is limited, it continues under R.C. 2953.08(G)(2)(a). We must examine the evidence in the record that supports the trial court's findings. We may modify or vacate the sentence only if it clearly and convincingly finds that the evidence does not support the trial court's R.C. 2929.14(C)(4) findings. R.C. 2953.08(G)(2)(a).

**{¶ 67}** This language is plain and unambiguous and expresses the General Assembly's intent that appellate courts employ a deferential standard to the trial court's consecutive sentence findings. R.C. 2953.08(G)(2) also ensures that an appellate court does not simply substitute its judgment for that of a trial court. *State v. Glover*, 2024-Ohio-5195, ¶ 46.

**{¶ 68}** In assessing whether the record supports the trial court's findings, R.C. 2953.08(F) requires this court to review the entire trial court record, including any oral or written statements made to or by the trial court at the sentencing hearing, and any presentence, psychiatric, or other investigative report that was submitted to the court in writing before the sentence was imposed. R.C. 2953.08(F)(1) through (4).

22.

**{¶ 69}** The record here, reviewed in its entirety, supports the imposition of consecutive sentences. Accordingly, appellant's second assignment of error is found not well-taken.

**Conclusion**

**{¶ 70}** The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

JUDGE

Myron C. Duhart, J.

JUDGE

Christine E. Mayle, J.
DISSENTS AND WRITES
SEPARATLEY.

**MAYLE, J., dissenting.**

**{¶ 71}** Appellant, Thomas Fong, pleaded guilty under *North Carolina v. Alford*, 400 U.S. 25, (1970), to four felony counts of practicing medicine without a license and two misdemeanor counts of sexual imposition. At his sentencing hearing, the trial court

23.

determined that he should serve his felony sentences consecutively. The court did not, however, clearly articulate its findings under R.C. 2929.14(C)(4). Because the sentencing transcript does not show that the trial court made all of the necessary consecutive-sentence findings, I dissent.

{¶ 72} Before a trial court can impose consecutive sentences, it must make three separate statutory findings under R.C. 2929.14(C)(4) at the sentencing hearing and in the sentencing entry. *State v. Beasley*, 2018-Ohio-493, ¶ 252-253; *State v. Bonnell*, 2014-Ohio-3177, ¶ 26. The court must find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger that the offender poses to the public; and (3) R.C. 2929.14(C)(4)(a), (b), or (c) is applicable. *Beasley* at ¶ 252. It is not required to state the reasons for its findings or precisely recite the language of the statute, but a reviewing court must be able to "discern that the trial court engaged in the correct analysis and [] determine that the record contains evidence to support the findings . . . ." *Bonnell* at ¶ 29; *State v. Jones*, 2024-Ohio-1083, ¶ 11. To make those determinations, we are able to "liberally review" the entire sentencing transcript. *State v. Sylvester*, 2022-Ohio-3798, ¶ 20 (10th Dist.); *State v. Hoy*, 2024-Ohio-1555, ¶ 13 (10th Dist.) (When the trial court does not use the language of the statute, "we must sift through the sentencing transcript to determine whether the words the trial court did use during the hearing satisfy R.C. 2929.14(C)(4)'s dictates.").

24.

{¶ 73} In this case, the trial court clearly made a finding under R.C. 2929.14(C)(4)(b). However, I cannot discern anything in the transcript to support the conclusion that the trial court found that consecutive sentences are (1) necessary to protect the public from future crime or to punish Fong, or (2) not disproportionate to the seriousness of Fong's conduct and the danger he poses to the public.

{¶ 74} The majority points to the trial court's statements that "a licensing requirement at some point could have uncovered part of this, but certainly licensing requirements led to the victimization of [A.T.] and [A.S.]" and "[t]he behavior of Mr. Fong is in complete disregard for the appropriate care of his patients[,]" as well as its consideration of Fong's pattern of conduct and multiple victims, to show that it made a finding that consecutive sentences were necessary to protect the public or punish Fong. But none of that speaks to protecting the public or punishing Fong. And, on this record, it would be a stretch to find that the trial court describing Fong's behavior as "despicable" and maybe predatory shows that the court found consecutive sentences necessary to protect the public or punish Fong. Appellate courts have found that the trial court made a protect-or-punish finding when the court mentioned the defendant's inability to follow society's rules or lengthy criminal history. *See, e.g., Bonnell* at ¶ 33; *State v. Woofter*, 2019-Ohio-1166, ¶ 16 (11th Dist.). But there is nothing equivalent to that in the trial court's comments here.

{¶ 75} Further, the record does not show that the trial court engaged in the full proportionality analysis required under R.C. 2929.14(C)(4). This part of the consecutive-

sentence calculus requires the trial court to consider *both* that consecutive sentences are not disproportionate to the seriousness of the offender's conduct *and* that they are not disproportionate to the danger the offender poses to the public. *State v. McCoy*, 2022-Ohio-995, ¶ 22 (12th Dist.). Courts have recognized that there is some "overlap" between the required proportionality finding and the finding under subsection (C)(4)(b), so a finding under (C)(4)(b) can sometimes double as part of the trial court's proportionality finding. *Hoy* at ¶ 17-18; *State v. White*, 2017-Ohio-7797, ¶ 14-15 (7th Dist.).

{¶ 76} The trial court here mentioned the seriousness of Fong's conduct as part of its (C)(4)(b) finding, which is arguably sufficient to find that the trial court considered whether consecutive sentences were not disproportionate to the seriousness of Fong's conduct. *See Hoy* at ¶ 18. However, a trial court must consider *both* parts of the proportionality finding, and nothing the trial court said in this case indicates that it considered whether consecutive sentences are not disproportionate to the danger Fong poses to the public.

{¶ 77} The state relies on the court's comments about "balancing" "bricks" and "feathers" to argue that the court engaged in a proportionality analysis. However, the context of these statements clearly shows that the court was "balancing" whether prison or community control was the appropriate sanction, which is quite different from balancing whether serving multiple prison sentences consecutively is not disproportionate to the seriousness of the offender's conduct and the danger he poses to the public. *See*

26.

*State v. Schaus*, 2024-Ohio-1515, ¶ 17 (6th Dist.) (Balancing the seriousness and recidivism factors in R.C. 2929.12 is not equivalent to a proportionality analysis under R.C. 2929.14(C)(4) because R.C. 2929.12 findings "relate only to individual sentences and the determination of whether the offender is more or less likely to commit future crimes."). In other words, nothing about the bricks-and-feathers statements indicates that the trial court was weighing the seriousness of Fong's crimes and the danger he poses to the public against the appropriateness of consecutive sentences. *Id.* at ¶ 16, quoting *State v. Elmore*, 2016-Ohio-890, ¶ 58 (7th Dist.). ("'Inherent in the proportionality finding is that a trial court engage in a weighing process, comparing or balancing *these two factors*, which it stands in the best position to do.'" (Emphasis added.)).

{¶ 78} Because I am unable to discern from the record that the trial court made all three R.C. 2929.14(C)(4) findings, I would find Fong's first assignment of error well-taken, find his second assignment of error moot, and remand the matter to the trial court for resentencing.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.